# UNITED STATES DISTRICT COURT

__NORTHERN__ DISTRICT OF __ILLINOIS, EASTERN DIVISION__

UNITED STATES OF AMERICA

v.

TONY CALLION, also known as "Tone,"
DANIEL GIBBS,
ISRAEL COLLINS,
SHERMAN SWOPES,
HAL DURHAM, and
NATALIE HOISSINGTON

CRIMINAL COMPLAINT

**MAGISTRATE JUDGE COLE**

CASE NUMBER:

**08 CR 549**

I, Brian Wentz, being duly sworn, state that the following is true and correct to the best of my knowledge and belief. On or about __July 10, 2008,__ in __Cook__ County, in the __Northern__ District of __Illinois__ defendants ANTHONY CARRION, DANIEL GIBBS, ISRAEL COLLINS, SHERMAN SWOPES, HAL DURHAM, and NATALIE HOISSINGTON did

attempt to obtain by extortion money, namely approximately $40,000 in United States Currency, belonging to, and in the care, custody, control, management, and possession, of TCF Bank, the deposits of which were then insured by the Federal Deposit Insurance Corporation,

in violation of Title __18__ United States Code, Sections __2113(a) and 2__.

I further state that I am a __Special Agent with the Federal Bureau of Investigation__ and that this complaint is
                                                                  Official Title
based on the following facts:

See attached affidavit

Continued on the attached sheet and made a part hereof:  _X_ Yes    ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

__July 11, 2008__                     at      __Chicago, Illinois__
Date                                                  City and State

Jeffrey Cole, U.S. MAGISTRATE JUDGE      _____
Name & Title of Judicial Officer                Signature of Judicial Officer

FILED
JUL 11 2008
7-11-08
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## Affidavit in Support of Criminal Complaint

I, Brian Wentz, a Special Agent for the Federal Bureau of Investigation (FBI), Chicago Division, being duly sworn under oath, states as follows:

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed for approximately five years. I am assigned to the FBI Chicago Division Field Office, South Resident Agency, Violent Crimes and Major Offenses Unit, where my duties include the investigation of various violent crimes, including kidnaping and bank robberies.

2. I make this affidavit based on personal knowledge and that gained from my participation in the investigation, including my review of reports and conversations with law enforcement officers and others. I submit that there is probable cause to believe that on or about July 10, 2008, at Chicago and other places, Tony CALLION, also known as "Tone," Daniel GIBBS, Israel COLLINS, Sherman SWOPES, Hal DURHAM, and Natalie HOISSINGTON attempted to obtained by extortion money, namely approximately $40,000 in United States Currency ("USC") belonging to, and in the care, custody, control, management, and possession, of TCF Bank, the deposits of which were then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Sections 2113(a) and 2. Because of the limited purpose of this affidavit, this affidavit does not include all of the information that I have acquired during this investigation.

3. An individual herein identified as Victim A, a bank teller at a TCF Bank at 10350 South Pulaski Road in Oak Lawn, Illinois, advised the Oak Lawn Police Department on July 10, 2008, that at approximately 5:00 a.m. that same day, she began receiving phone calls on her U.S. Cellular phone from a U.S. Cellular phone number that she recognized as belonging to her

1

fiancee, an individual herein identified as Victim B. Victim A stated that she knew the call came from Victim B's cell phone because the Caller ID Function on her own cell phone showed the incoming number. According to Victim A, she and Victim B had been residing together for approximately two years, and had recently become engaged to be married.

4. Victim A advised that she initially allowed the phone calls from Victim B's cell phone to go to voicemail. At approximately 7:00 a.m., Victim A answered one of the phone calls from Victim B's cell phone and spoke with Victim B. Victim A related to law enforcement that Victim B stated, in effect, that he had been kidnaped and that the kidnappers were demanding $20,000 in ransom for his return.

5. Victim A further related to law enforcement that, between approximately 7:00 a.m. to approximately 10:30 a.m, she received about 10 additional telephone calls from Victim B's cell phone. At some point during one of these calls, Victim B stated that the kidnappers had changed their ransom demand and were now demanding as ransom for Victim B's return all the money in the vault at the TCF Bank where she worked. Victim A advised that, during the later telephone calls from Victim B's cell phone, she could hear a male voice shouting and other noise in the background.

6. Victim A had last seen Victim B at his mother's residence in Chicago at about 8:00 or 9:00 p.m. the night before, on July 9, 2008. When Victim A awoke on the morning of July 10, 2008, in the residence that she and Victim B share, Victim B was not there. Shortly after receiving the telephone call from Victim B at 7:00 a.m., Victim A proceeded to the TCF Bank in Oak Lawn, Illinois, where she met with members of law enforcement.

7. Victim A continued to receive telephone calls from Victim B's cell phone.

Victim A related that she mostly spoke with Victim B, but occasionally would speak with unknown individuals that she understood to be the kidnappers. According to Victim A, the kidnappers identified a specific location where they wanted the ransom money to be brought. The kidnappers later communicated that they wanted the ransom money to be brought to a different location ("the drop location"). The FBI arranged to do a "money drop" nearby the drop location. TCF Bank provided to the FBI a bank bag containing approximately $40,000 USC. A tracking device was placed inside the bag. The tracking device was placed in a stack of bills among other bill stacks in the bag. At the direction of FBI agents, Victim A left the bag near, but not at, the drop location.

8. After Victim A left the bag at the location designated by the FBI, she related that she received another telephone call. Victim A related that the kidnappers expressed anger that Victim A did not bring the bag to the specific drop location. According to Victim A, the kidnappers communicated that they would kill or harm Victim B if she did not move the bag to the designated drop location.

9. Following FBI agents' instructions, Victim A refused to move the bag from the nearby location during this phone call. According to Victim A, the kidnappers relented, but advised that, if they were followed by law enforcement, they would kill or harm Victim B.

10. FBI agents conducted air and on-the-ground surveillance of the bag containing the tracking device. Agents observed a black Dodge Durango, with Wisconsin license plate "142NHW," and Vehicle Identification Number ("VIN") later learned to be 1B4HS28Z4YF104637, and a gold GMC Savana, with Illinois license plate "X417535," and a VIN later learned to be 1GDFG15RXX1010375, arrive at the location where Victim A left the

bag. An individual got out of one of the vehicles, retrieved the bag, and returned to the vehicle before both vehicles drove away.

11. FBI agents followed the vehicles through air and on-the-ground surveillance to the premises located at 410 West 119th Street, in Chicago, Illinois. FBI agents observed individuals leaving both the Dodge Durango and the GMC Savana and entering the premises located at 410 West 119th Street, Chicago, Illinois.

12. After a short period of time, the Dodge Durango attempted to leave the premises, and drive through the driveway to an alley and onto 119th Street. At that point, FBI agents conducted a stop of the Dodge Durango. A female, later identified as Natalie HOISSINGTON, was the driver. The GMC Savana remained parked at the premises.

13. After the Dodge Durango was stopped, FBI agents entered through the back door of the residence at 410 West 119th Street. FBI agents heard the sounds of individuals running up the stairs. FBI agents found Victim B in a room on the first floor with duct-tape around his eyes and head and with his hands handcuffed behind him on a chair. FBI agents released Victim B. At some point FBI agents encountered two pit bulls in the residence, which they shot.

14. FBI agents went up the stairs to the second floor and located 5 individuals, all of whom were hiding in various rooms. These individuals were later identified as Tony CALLION, Daniel GIBBS, Israel COLLINS, Sherman SWOPES, and Hal DURHAM. One individual, Israel COLLINS, was found with Victim B's identification card on his person. A second individual, Daniel GIBBS, was found with approximately $1,700 USC on his person.

15. A search of the premises at 410 West 119th Street, Chicago, Illinois revealed a shotgun and a pistol, along with approximately $42,000 USC found mostly on the second floor of

the residence. The stack of bills containing the tracking device was found in the Dodge Durango, along with packaging for handcuffs.

### Victim B Interview

16. FBI agents interviewed Victim B, who related that he was returning to the residence that he shared with Victim A at approximately 3:00 a.m. on July 10, 2008. At that time, two black males approached him. One of the males had a shotgun and the other one had a silver 9 millimeter handgun. The two males handcuffed and forced Victim B into what Victim B believed was a van. Victim B related to law enforcement that the two individuals drove him to a location, and put a bag over his head before leading him into a residence. Victim B further stated that he was then placed in a room inside the residence and did not believe that he had been moved before FBI agents subsequently found him. According to Victim B, he was blindfolded with duct tape and handcuffed to a chair with a pit bull guarding him. At some point during the kidnapping, Victim B was shot in the leg and hit in the foot with some instrument. Victim B also stated that the kidnappers played "Russian roulette" with him based on the sounds from a firearm and statements that he had heard.

### Statements by Defendants

A. **HOISSINGTON'S Statement**

17. After being advised of and agreeing to waive her *Miranda* rights, HOISSINGTON described the kidnaping to law enforcement. HOISSINGTON identified Daniel GIBBS as her boyfriend and Hal DURHAM as GIBBS's father. Both GIBBS and DURHAM live at the residence at 410 West 119th Street, Chicago, Illinois.

18. According to HOISSINGTON, she learned about a plan to kidnap Victim B on or

5

about July 9, 2008. HOISSINGTON stated that she agreed to and did, drive two black males, whose names she did not know at the time, in a blue GMC Envoy. HOISSINGTON provided a description of both individuals, which descriptions matched the appearance of COLLINS and SWOPES. HOISSINGTON was aware that GIBBS and CALLION were also driving around nearby, helping to locate Victim B. HOISSINGTON further related that, once they located Victim B, the individuals later identified as COLLINS and SWOPES approached Victim B, and pointed firearms at him. According to HOISSINGTON, Victim B was handcuffed and placed in the GMC Envoy. Once Victim B was taken, HOISSINGTON drove the GMC Envoy, containing COLLINS, SWOPES and Victim B, back to the premises located at 410 West 119th Street, Chicago, Illinois.

19. HOISSINGTON recounted that, after she returned to 410 West 119th Street, Chicago, Illinois, there were a total of five other individuals at the premises: her boyfriend GIBBS, his father DURHAM, CALLION, COLLINS, and SWOPES. HOISSINGTON related that all of these individuals discussed the kidnaping and talked through the plan of how to proceed, with CALLION doing most of the talking and leading the discussion.

20. HOISSINGTON observed, at various times, each of the five other individuals go into the room where Victim B was being held. At one point, HOISSINGTON saw that Victim B was duct-taped around the head. HOISSINGTON stated that she was aware that GIBBS made calls on Victim B's cell phone and that various defendants were holding the cell phone up to Victim B's ear for him to speak at various times throughout the day.

21. Later on or about July 10, 2008, HOISSINGTON was instructed to go pick up the money at the designated drop location. According to HOISSINGTON, CALLION accompanied

her in the Dodge Durango and DURHAM went in to the GMC Savana. HOISSINGTON reports that DURHAM picked up the money and, after he did so, they traveled back to the residence at 410 West 119th Street in their respective vehicles.

22. HOISSINGTON reported that, once inside the residence, all six individuals, including herself, began spreading out and counting the money. One of the defendants came upon the tracking device. According to HOISSINGTON, DURHAM took the tracking device and first threw it in the backyard. After a few minutes, DURHAM retrieved the tracking device and then told HOISSINGTON to take the tracking device and toss it out on the street. HOISSINGTON attempted to drive away from the premises with the tracking device, at which point law enforcement stopped her in the Dodge Durango.

### B.  SWOPES'S Statement

23. After being advised of and agreeing to waive his *Miranda* rights, SWOPES admitted that CALLION, GIBBS, COLLINS, DURHAM, HOISSINGTON, and SWOPES were all involved in the kidnaping of Victim B. According to SWOPES, CALLION picked up SWOPES in a black Dodge Durango at about 2:00 a.m. on or about July 10, 2008. SWOPES further related that CALLION asked SWOPES, in effect, if SWOPES wanted to "hit a lick," which SWOPES understood as asking SWOPES if he wanted to commit a robbery. SWOPES related that he got into the Dodge Durango with CALLION.

24. SWOPES related that CALLION and SWOPES drove around, meeting up with GIBBS, COLLINS, and HOISSINGTON, who were in a blue GMC Envoy. They were looking for Victim B, and found him at around 2:00 a.m. According to SWOPES, they saw Victim B talking on the street to a female.

25. According to SWOPES, the passengers in the cars were reconfigured, with GIBBS and CALLION ending up in the Dodge Durango, and SWOPES, COLLINS and HOISSINGTON in the blue Envoy. At that point, SWOPES stated that he was handed a handgun and told that he had to be the one to grab Victim B because Victim B could recognize the others.

26. According to SWOPES, the two cars followed Victim B in his own car to Victim B's residence. SWOPES admitted that he handcuffed Victim B and threw him in the blue GMC Envoy. SWOPES also related to law enforcement that he duct-taped Victim B's eyes.

27. According to SWOPES, Victim B was transported to the premises at 410 West 119th Street, Chicago, Illinois, where Victim B was placed in a room. SWOPES related that CALLION expressed anger at SWOPES for not sufficiently duct-taping Victim B, and was concerned that Victim B was able to see the kidnappers. SWOPES watched CALLION walk into the room with Victim B, and he heard the sound of duct-tape being wrapped around an object multiple times. At one point later, SWOPES also reported seeing CALLION hit Victim B's foot with a wrench.

28. According to SWOPES, Victim B was asked about ways to obtain money to secure his release. SWOPES related that Victim B, among other ideas, identified Victim A as his fiancee and informed the kidnappers that Victim A worked at TCF Bank. SWOPES stated that he, CALLION, and GIBBS all spoke with Victim A on the telephone at various times throughout the day on or about July 10, 2008. SWOPES admitted to holding the telephone to Victim B's head so that Victim B could speak to Victim A.

29. Once arrangements for the ransom were made, SWOPES explained to FBI agents

that HOISSINGTON first went to get the ransom money but reported back that the ransom money was not in the correct location. At that point, everyone but SWOPES and GIBBS left the premises.

30.   After a period of time, CALLION, DURHAM, COLLINS, and HOISINGTON returned to the premises with money, and all six individuals then began to divide up the money. SWOPES stated that, when they discovered the tracking device, SWOPES saw DURHAM throw the transmitter outside. Shortly thereafter, the kidnapers realized that law enforcement had arrived. SWOPES then described a chaotic scene, with defendants throwing money that they previously had received during the split to the ground, and other defendants grabbing the money, and running through the house. SWOPES stated that he ran upstairs and hid. Law enforcement subsequently found SWOPES, CALLION, COLLINS, GIBBS, and DURHAM hiding upstairs.

## CONCLUSION

31. Based on the aforementioned factual information, your affiant respectfully submits that there is probable cause to believe that, on or about July 10, 2008, at Chicago and other places, Tony CALLION, also known as "Tone," Daniel GIBBS, Israel COLLINS, Sherman SWOPES, Hal DURHAM, and Natalie HOISSINGTON attempted to obtain by extortion money, namely $40,000 in United States Currency ("USC") belonging to, and in the care, custody, control, management, and possession, of the TCF Bank, the deposits of which were then insured by the Federal Deposit Insurance Corporation, in violation of Title 18, United States Code, Sections 2113(a), and 2.

FURTHER AFFIANT SAYETH NOT

_____
Brian Wentz, Special Agent
Federal Bureau of Investigation

Sworn and subscribed before me on this 11th day of JULY, 2008.

_____
JEFFREY COLE
UNITED STATES MAGISTRATE JUDGE