UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 08 CR 549-4 |
| vs. | ) | Judge David H. Coar |
| | ) | |
| SHERMAN SWOPES | ) | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorney, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, hereby files this Government's Sentencing Memorandum as to defendant SHERMAN SWOPES, seeking a sentence within the advisory Guideline range of 271 to 308 months, pursuant to U.S.S.G. § 4B1.1(c)(3) and the ten-year mandatory minimum penalty for Count Three's 18 U.S.C. § 924(c) violation.

**I.    BACKGROUND**

Defendant SWOPES pleaded guilty pursuant to a blind plea to attempted bank extortion, in violation of 18 U.S.C. § 2113(a), (Count Two of the Amended Indictment) and the use and carrying of firearms during and in relation to the attempted bank extortion, in violation of 18 U.S.C. § 924(c), (Count Three of the Amended Indictment). The government incorporates the facts set out in the Government's Version of the offense and read by the government at the change of plea hearing and acknowledged by defendant SWOPES as true, but briefly summarizes the relevant facts.[1]

In the early hours of July 10, 2008, SWOPES joined a conspiracy to kidnap and hold for ransom Individual B, with the ransom ultimately coming from an attempt to extort the TCF Bank.

---

[1] These relevant facts are in part from the testimony of codefendants Daniel Gibbs and Natalie Hoisington at the trial of codefendant Hal Durham, over which this Court presided. This Court and defense counsel have previously been provided with a complete version of the transcripts for both witnesses. Citations to transcript of Hal Durham's trial are denoted with "Tr. at [page number]."

SWOPES's fellow coconspirators included Tony Callion, who initiated the conspiracy, Israel Collins, Hal Durham, Daniel Gibbs, and Natalie Hoisington. Part of SWOPESs role was to undertake the actual kidnaping of Individual B, which occurred at approximately 3:00 a.m. on July 10, 2008 in front of Individual B's house and shortly after SWOPES agreed to join the conspiracy and went with Callion to pick up codefendant Collins. In kidnaping Individual B, SWOPES used a Rossi, .38 caliber revolver, bearing the serial number E050772., while codefendant Collins carried a 12-gauge Winchester shotgun, bearing the serial number L2889639. Tr. at 53-54, 268-269. SWOPES handcuffed Individual B, and both Collins and SWOPES placed Individual B in the back of a blue Envoy, driven by Hoisington. Tr. at 53-54, 269.

Once Individual B was in the Envoy, Hoisington drove SWOPES and Collins in the Envoy, following Callion and Gibbs who were in a black Durango, to an alley next to Durham's house. Tr. at 55-56, 271. Durham arrived shortly thereafter. Tr. at 57, 274. While SWOPES and the others were in the alley trying to determine how to get Individual B into Durham's house, Gibbs accidentally discharged the 12-gauge shotgun inside the Envoy. Tr. at 58-59, 61-63, 276-78.

SWOPES, along with other co-defendants, placed Individual B in a room off the kitchen of Durham's house and restrained Individual B in a chair. Tr. at 63-67, 280. Individual B had duct-tape around his eyes, head, and legs, and handcuffs were still on his wrists. Tr. at 67, 282. At different times, SWOPES, Callion, Collins, Gibbs, and Durham were present in the room with Individual B, and certain of the defendants were at times using physical force and threats to demand ransom for his release. Tr. at 68-78, 284. Durham loaded the .22 caliber revolver was loaded with .22 caliber low velocity power load ammunition, or blank, and Durham fired the blank from the

revolver at Individual B.[2]  Tr. at 68-71, 288.  In SWOPES's presence, Callion used a wrench to pull up on Individual B's toe.  Tr. at 76-77.  Also in SWOPES's presence, Gibbs threatened to use a potato as a silencer.  Tr. at 78.  The threats and the firing of the blank at Individual B was done to scare Individual B into obtaining ransom from his release.  While Individual B was being held and TCF Bank was being extorted, codefendant Collins at times had the .38 caliber revolver and at times the .38 caliber revolver was in the room with Individual B.  Tr. at 77, 183, 282.

     Individual B offered the names of three individuals as sources for ransom: a woman named "Nelly," a man named "Bob," and his fiancé who worked a bank, hereinafter "Individual A."  Tr. at 81-82, 89.  Early in the morning at approximately 5:00 a.m., Gibbs told Callion, Collins, Durham, and SWOPES in the kitchen that Individual B said he would have Individual A steal money from the bank where she worked for his ransom.  Tr. at 89-92.  At that point, defendants began to make phone calls to Individual A demanding that she get money from the TCF Bank for her.  Tr. at 92.  SWOPES and Collins were present when Gibbs and Individual B made the first calls to Individual A for the ransom from the bank.  Tr. at 92, 94.  SWOPES participated in at least two of these telephone calls, including the last call in which SWOPES threatened to kill Individual B if Individual A had contacted the police.  Tr. at 124, 126; Government Ex. Recording 1B.[3]  These telephone ransom demands ultimately led to Individual A's dropping off of about $40,000 in TCF Bank ransom money, under the instruction and surveillance of FBI agents and other law enforcement, and the picking up of the ransom money by codefendants Durham, Callion, and

---

[2] At SWOPES's change of plea hearing, he acknowledged that he saw codefendant Durham with the .22 caliber revolver, but stated that he did not see codefendant Durham fire the .22 caliber revolver.

[3] The government anticipates entering this exhibit, previously provided to defense counsel, into evidence at defendant's sentencing.

Hoisington. Tr. at 99-103, 130-131, 291-298. These codefendants brought back to Durham's house—where SWOPES and the others were waiting—the TCF Bank ransom money and began to divide the money in the living room. Tr. at 131-132, 300. The ransom money was bundled with bank straps and also contained a tracking device, which defendants subsequently found. Tr. at 131-132, 299. Law enforcement subsequently entered the house and arrested the defendants. When law enforcement located SWOPES, he was hiding under a bed with Gibbs in a bedroom upstairs, which had TCF Bank money hidden in four locations within the room. Tr. at 134.

## II.     ADVISORY GUIDELINES CALCULATIONS

### A.     One Clarification to the PSR

On page 19, line 422-24 of the PSR, the Probation Officer acknowledged that, for the offense of 18 U.S.C. § 924(c) (Count Three), "the minimum term of imprisonment is ten years to life" and must be served consecutive to the offense of attempted bank extortion (Count Two), and the Probation Officer calculated an advisory Guideline range of 151 to 188 months plus the consecutive sentence. The ten-year mandatory minimum is based on a finding that SWOPES is legally liable for codefendant Gibbs's accidental discharge of the shotgun and Durham's discharge at Individual B of the construction load from the .22 caliber revolver. Ultimately, based on a blind plea's nature, this Court decides whether SWOPES should receive the ten-year mandatory minimum for a discharge.

Because SWOPES is a career offender and he has pleaded guilty to a § 924(c) offense, SWOPES's advisory guideline range should be calculated under Guideline § 4B1.1(c)(3). Assuming SWOPES receives the ten-year mandatory minimum sentence for the § 924(c) offense and the third acceptance-of-responsibility point, his advisory Guideline range should be 271 to 308 months' imprisonment. U.S.S.G. § 4B1.1(c)(3).

**B.     This Court Should Find that There was a Discharge Under the § 924(c) Offense**

Because SWOPES is liable for the discharge by Gibbs of the shotgun and the discharge by Durham of construction loads from the .22 caliber revolver, this Court should apply the 10-year mandatory minimum for the § 924(c). Having jointly undertaken the criminal activity of the kidnaping of Individual B in order to ultimately extort the TCF Bank, SWOPES is accountable for the reasonably foreseeable conduct of his accomplices. *See United States v. Katalinic*, 510 F.3d 744, 748 (7th Cir. 2007) (holding defendant liable under § 924(c) for the death threat uttered by his codefendant); *United States v. Roberson*, 474 F.3d 432, 433(7th Cir. 2000) (recognizing that it was irrelevant, for purposes of liability, whether a defendant convicted of bank robbery and using a gun in relation to the bank robbery carried the gun or one of his accomplices did). "[A]n act is reasonably foreseeable if it is a necessary or natural consequence of the lawful agreement." *United States v. Clover*, 199 F.3d 1270, 1274 (11th Cir. 2000) (discussing and citing cases of the reasonable foreseeability of acts where the original plan went array).

Here, the discharge of the two firearms was reasonably foreseeable to SWOPES. SWOPES himself at first brandished the .38 caliber revolver (while Collins brandished the 12-gauge shotgun) when SWOPES first abducted Individual B. SWOPES then was aware and knew guns were present and being used in connection with the kidnaping for a ransom, which ultimately came from the TCF Bank. *See United States v. Franklin*, 321 F.3d 1231, 1236 (9th Cir. 2003) (holding that a firearm's discharge was reasonably foreseeable to a defendant who knew that his coconspirators were planning a credit union robbery with guns in a threatening manner). No ransom could have been obtained without having abducted Individual B, and thus the abduction was

5

the part and parcel of the offense. Further, the use of the guns during the abduction of Individual B ensured that Individual B was intimidated into providing sources for ransom money, including the TCF Bank. This was a violent crime, involving guns, the discharge of any one or all being reasonably foreseeable to the participants. Thus, the accidental discharge by Gibbs of the shotgun was reasonably foreseeable to SWOPES, as was Durham's obtaining the .22 caliber revolver and discharging a construction load from the .22 caliber revolver to scare Individual B into revealing ransom sources, including the TCF Bank.[4] *See United States v. Molina*, 106 F.3d 1118, 1121 (2d Cir. 1997) (overturning the district court's rejection of a discharge enhancement, finding that "Even if Molina hoped that the original plan would be carried out that no shooting would occur, it was nonetheless reasonable for him to foresee that, in an encounter with armed robbers and armed guards protecting an armored car, a shooting was likely to occur.").

Further, with regard to Gibbs's accidental discharge, the Supreme Court has recently held that the ten-year mandatory minimum for a discharge under § 924(c) applies to accidental discharges. *See Dean v. United States*, 129 S.Ct. 1849 (U.S. April 29, 2009) (holding that an accidental discharge still triggers the 10 year mandatory minimum because a discharge under § 924(c) does not require intent to discharge). Gibbs's accidental discharge, done in the midst of transferring the abducted Individual B into the house to continue holding him for ransom, which ultimately came from the TCF Bank, was during and in furtherance of the attempted bank extortion.

---

[4]Neither the statute or legislative history define a "discharge," and so its ordinary meaning must be applied. *See Smith v. United States*, 508 U.S. 223, 228 (1993). According to Merriam-Webster's online dictionary, a discharge means to "relieve of a charge, load or burden." *See* www.merriam-webster.com/dictionary/discharge (last visited on December 8, 2009). Under this definition, Durham's firing of low velocity power load ammunition, or a construction load, constitutes a discharge.

**III.     FACTORS UNDER 18 U.S.C. § 3553(a)**

   **A.     Legal Standards**

Post-*Booker v. United States*, 543 U.S. 220 (2005), 18 U.S.C. § 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[5] In order to determine the "particular" sentence to impose, the Court must consider the familiar statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range set by the Guidelines, and another is the Commission's policy statements. § 3553(a)(4), (a)(5). Although the Guidelines are advisory only, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 598 (2007).

For two reasons, this Court should give serious consideration to the advisory Guidelines range. First, the Guidelines are the *sole* factor in § 3553(a) that provide any objective sentencing range that can practicably promote the overall goal of minimizing unwarranted sentencing disparities, which is itself a statutorily-mandated factor, § 3553(a)(6). *See United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005) ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."); *see also Booker*, 543 U.S. at 250, 253, 267. Second, the Guidelines generally deserve serious consideration because they are "the product of careful study based on extensive empirical evidence derived from the review of thousands of

---

[5]Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

7

individual sentencing decisions." *Gall*, 128 S. Ct. at 594. The Commission is charged by statute to periodically review and revise the Guidelines as the Commission collects comments and data from numerous sources in the criminal justice system, 28 U.S.C. § 994(o), and these ongoing efforts to refine the Guidelines are another reason to seriously consider the advisory range.

### B. 18 U.S.C. § 3553 (a)(1) - Nature of the Offense and History of the Defendant

Pursuant to 18 U.S.C. § 3553 (a), there are a number of factors for the Court to consider when determining the appropriate sentence. First, the Court should consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1). Consideration of these factors results in the conclusion that a within-Guidelines sentence of 271 to 308 months' imprisonment is just and reasonable.

#### 1. Nature of the Offense

The central actions that defendant SWOPES specifically undertook in this attempted bank extortion were those of sheer violence and threats. Defendant SWOPES was one of the two defendants in this attempted bank extortion who violently abducted a man off the street, armed with a .38 caliber revolver, enabling SWOPES and the codefendants to hold Individual B for ransom ultimately from the TCF Bank. Without SWOPES's willingness to join quickly in the plan to kidnap Individual B and locate Collins,[6] and without the fear that SWOPES and Collins were able to instill in Individual B when they abducted Individual B at gunpoint—fear that caused Individual B to ultimately call his bank teller fiancé for ransom from the TCF Bank—the defendants could not have undertaken the attempt to extort ransom from the TCF Bank. Moreover, it was SWOPES who

---

[6]This was not the first time SWOPES and Collins committed a crime of violence together. Both were convicted of a 2003 aggravated battery.

8

threatened to kill Individual B if Individual A contacted any law enforcement, telling Individual A in a recorded call that "if any police came we're killing him," referring to Individual B. Tr. at 126.

SWOPES's rapid decision to join the plan to kidnap Individual B, locate Collins, and ultimately attempt to extort the TCF Bank, is an additional aggravating factor. SWOPES took little time to jump into and participate in hugely violent crime—physically undertaking the abduction and later making a threat of death. SWOPES's actions demonstrate a serious lack of value for human life. SWOPES's willingness to use guns and violence to commit this crime elevated the danger not just to Individual B, but other innocent bystanders, and even to his codefendants. Moreover, SWOPES's active involvement in this offense and his previous relationship with codefendant Collins run contrary to his statement in his plea declaration that he was scared he would be harmed by his codefendants if he withdrew from the scheme and that he feared for his safety.

### 2. Criminal History

At the age SWOPES committed this violent crime, 24 years old, SWOPES already has had such an extensive criminal history as to qualify for both the Career Offender Guideline and a Criminal History Category of V, with 10 criminal history points. SWOPES's criminal history began at age 13, with the possession of cocaine and the unsatisfactory termination of probation. PSR at 9, line 181-182. By age 17, SWOPES had escalated his criminal conduct from mere possession to possession with in tent to deliver cocaine, for which his probation was also unsatisfactorily terminated. PSR at 10, line 195-196. At the age of 19 SWOPES teamed up with codefendant Collins, as previously stated in footnote 6, to commit the violent act of aggravated battery, striking of a victim with a piece of wood repeatedly about the head and causing serious injury. PSR at 11, line 203-212. Following that conviction, SWOPES continued to commit another drug offense in

9

2005, being convicted of delivery of crack cocaine. *Id*. at line 217-221. As in the past, undeterred by his probationary status, SWOPES committed the instant offenses while on parole and less than two years after this last conviction. PSR at 12, line 228-236. In addition to these convictions and probation violations, SWOPES has 9 arrests, 6 of which relate to drugs. PSR at 12-14.

SWOPES's criminal history not only shows a long record for someone so young, but also a blatant disregard for the criminal justice system. With almost every conviction, SWOPES has violated his probation or parole or had his probation terminated unsatisfactorily. SWOPES's consistent disrespect for the criminal justice system demonstrates more than anything else the need impose a within Guideline sentence, both for specific deterrence and to protect the public from a defendant who has shown a serious lack of esteem for human life and the rule of law.

### 3. SWOPES's Mental Capacity and Substance Abuse

During the course of this case, defendant SWOPES was first evaluated for mental competency by Dr. Ronald Nieberding, a clinical pyschologist at the Metropolitan Correctional Center in Chicago and later for the purposes of mitigation at sentencing by Dr. Robert Hanlon, a clinical neuropsychologist at Northwestern University Feinberg School of Medicine. In reviewing the two reports, there are little material differences in their assessments of SWOPES's mental capacity. The main differences between the two evaluations can be summarized as follows: (1) the purposes of each evaluation, and thus the tests and screening used as to each evaluation; (2) some difference in IQ points presumably due to defendant SWOPES's not malingering during his second evaluation; (3) Dr. Nieberding's assessment that defendant has an antisocial personality disorder; and (4) Dr. Hanlon's failure to take into account SWOPES's substance abuse and antisocial disorder

in his recommendation regarding SWOPES's rehabilitation prospects. Both evaluations point in favor of a within-Guideline sentence, based on SWOPES's continued danger to the public.

Dr. Hanlon appears to raise two main criticisms of Dr. Nieberding's evaluation: (1) Dr. Niedberding's use of the Wechsler Abbreviated Scale of Intelligence instead of the Wechsler Adult Intelligence Scale and (2) his characterization of SWOPES as "low borderline range," after SWOPES scored a 68 on an IQ test in which he demonstrated evidence of malingering instead of "extremely low" or "Mental Retardation" range for scores lower than 70. Hanlon's Report at 3. These criticisms do not materially affect this Court's assessment of defendant Swopes's mental capacity. First, Dr. Nieberding's evaluation was for mental competency, and thus he used an abbreviated version of the tests given to SWOPES by Dr. Hanlon, which included many of the same subtests.[7] Second, Dr. Hanlon's own administration of the Wechsler Adult Intelligence Scale-IV demonstrates that SWOPES functions at a higher level than Dr. Neiberding's test results when not malingering. Despite scoring a 68 when SWOPES was malingering during Dr. Nieberding's examination, SWOPES scored a 74 on the IQ test when administered by Dr. Hanlon, which is within the range of "low borderline range."[8] Taking into account that SWOPES demonstrated malingering tendencies when being evaluated by Dr. Neiberding, there appears to be little real difference in their assessments of SWOPES's mental capacity for learning.

---

[7] If called to testify, the government anticipates that Dr. Nieberding would respond to Dr. Hanlon's calling Dr. Nieberding's choice of tests "unusual and questionable," Dr. Hanlon' Report at 3, with the following. According to Dr. Nieberding, his test was meant to be a screening and his use of the abbreviated test was appropriate for the purpose of determining mental competency, as compared the need for a more detailed analysis when assessing one's mental capacity for mitigation purposes.

[8] If called to testify, that government anticipated that Dr. Nieberding would explain that it is not his practice and he finds it inappropriate to classify someone as within the range of mental retardation on the basis of an IQ test alone, especially given that one of the factors of mental retardation is its onset in one's youth.

The real distinction that affects both sentencing and Dr. Hanlon's optimistic recommendation of rehabilitation with proper education and counseling is Dr. Hanlon's failure to give proper attention to SWOPES's long-term substance abuse and anti-social behavior. Dr. Nieberding determined that SWOPES met the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision ("DSM-IV-TR") criteria for, among other things, criteria for Cannabis Abuse and Antisocial Personality Disorder. Nieberbing's Report at 10-11. Dr. Nieberding described the Antisocial Personality Disorder as "marked by pervasive and long standing personality traits such as, impulsivity, tendency to violate the rules and standards of society, conflicted relationships, and a history of irresponsible and unlawful behavior." *Id*. at 11. In assessing SWOPES's history, Dr. Nieberding determined that SWOPES had exhibited this conduct associated with this disorder prior to age 15 (and thus prior to his head injuries). *Id*. Dr. Nieberding also found that SWOPES met the criteria for Borderline Intelligence Functioning and that a combination of factors likely contributed to this condition, including "effects of his head injury, chronic marijuana use, poor academic performance, and early behavioral problems." *Id*. When specifically discussing defendant SWOPES's head injury, Dr. Nieberding concluded that SWOPES's "current functioning is likely influenced to a greater extent by his life style choices (i.e., chronic substance use, criminal behavior), and emotional factors (i.e., under-developed coping skills [directly related to Cannabis abuse, see id. at 10], poor frustration tolerance." *Id*. at 12. With regard to his diagnosis, Dr. Nieberding had a "guarded" prognosis for SWOPES, stating that there were several factors "that would suggest long ter and substantive therapeutic gains will be difficult to achieve and maintain," including ""below average level of cognitive functioning, minimal family support, woefully under-developed level of positive coping skills, chronic history of substance use and anti-social behavior, and minimization

of his substance abuse history." *Id*. at 11. Dr. Nieberding did highlight some positive influences including the "presence of depressive symptoms, which can serve as a motivator for change, and his apparent emotional connection to his children." *Id*.

In contrast, aside from noting that chronic alcohol abuse and marijuana abuse since age 12 was causally related to SWOPES's mental capacity, Dr. Hanlon did not seem to factor in the effects of SWOPES's substance abuse when making his recommendation that education could decrease the likelihood of future criminal behavior following release. Hanlon Report at 1-2. More importantly, Dr. Hanlon did not even acknowledge any Antisocial Personality Disorder, and did not therefore factor this disorder into his assessment at all. Without considering the effects of SWOPES's substance abuse and his antisocial personality tendencies, Dr. Hanlon's recommendation does not fully account for SWOPES's capacity for rehabilitation and the danger he will still present to the public when released. While education may be able to provide SWOPES with some degree of rehabilitation, this Court respectfully should consider SWOPES's substance abuse and antisocial personality disorder in assessing specific deterrence for SWOPES, aggravation/mitigation, and his ability to achieve any sort of rehabilitation, and Dr. Nieberding's more comprehensive conclusions regarding SWOPES's prognosis.

Based on all of the above, a within-Guidelines sentence of 271 to 308 months' imprisonment is the appropriate, just and reasonable sentence to impose in this case.

    **C.    18 U.S.C. § 3553 (a)(2) - Reflect Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment and Deterrence and Protect the Public**

Section 3553(a) also directs the Court to consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford

13

adequate deterrence to criminal conduct and to protect the public from future criminal conduct of the defendant. Consideration of each of these factors also results in the determination that a sentence of 271 to 308 months' imprisonment is the appropriate sentence.

SWOPES's committing of attempted bank extortion and his use and carrying of firearms during that attempted bank extortion are serious and violent crimes, made all the more so by the fact that SWOPES chose to conspire with five other individuals to commit the attempted bank extortion using three guns. SWOPES, a career offender, who had repeatedly violated his probation and parole and managed to earn 10 criminal history points by the young age of 24, needs specific deterrence to discourage him from continuing his criminal career and from acting in concert with individuals such as Collins, with whom he has partnered more than once to commit violent offenses. Unfortunately, SWOPES's long term drug use, antisocial personality, coupled with his lower I.Q., make him a great danger to society and requires within-Guidelines prison term to ensure that the public is protected from his proven willingness to participate readily in criminal activity.

Moreover, a sentence within the advisory guideline range sends a message that the holding of individuals, bank employees, and banks hostage to the demands of and extortion by criminals is not tolerated. Those who work for financial institutions need to know that the courts stand firmly behind their safety and the safety of their loved ones and are willing to properly penalize those individuals who put bank employees and their loved ones in jeopardy. The sentence commensurate with the offenses of conviction is a sentence within the applicable Guidelines range.

### D.     18 U.S.C. § 3553 (a)(6) - Avoid Unwarranted Sentencing Disparities

Another factor for this Court to consider under Section 3553(a) is the need to avoid unwarranted sentencing disparities. As this Court is aware, the Guidelines are the *sole* factor in

§ 3553(a) that provide any objective sentencing range that can practically promote the overall goal of minimizing unwarranted sentencing disparities. *See Mykytiuk*, 415 F.3d at 608 ("The Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country."). In order to ensure uniformity, especially with five other defendants, a sentence within the applicable Guidelines range is appropriate here.

### III.   CONCLUSION

Taking into consideration the advisory guideline and 18 U.S.C. § 3553(a), this Court should impose a sentence of 271 to 308-months' imprisonment for defendant SWOPES. Such a sentence is just and reasonable and properly accounts for each of the § 3553(a) factors.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By:   /s/ Halley B. Guren
HALLEY B. GUREN
SHERI H. MECKLENBURG
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-4156

## CERTIFICATE OF SERVICE

      Halley B. Guren, an Assistant United States Attorney assigned to the instant matter, hereby certifies that the attached GOVERNMENT'S SENTENCING MEMORANDUM was served in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

                                                  /s/ Halley B. Guren
                                                  HALLEY B. GUREN
                                                  Assistant United States Attorney

DATE: February 16, 2010