**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **08 CR 549** |
| **v.** | ) | **Honorable Rebecca R. Pallmeyer** |
| **SHERMAN SWOPES** | ) | |

## AMENDED MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i)

NOW COMES the defendant, Sherman Swopes, by and through his attorney, Yelena A. Dolgosheeva, and respectfully moves this Honorable Court to grant defendant's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Mr. Swopes requests the Court to modify his sentence to time served and release him to begin his already-imposed five-year term of supervised release, and any additional terms and conditions of supervised release that this Court deems appropriate, which may include a period of home confinement.[1]

## I.     OFFENSES AND CO-DEFENDANTS[2]

Mr. Swopes was one of six defendants charged in this case in three counts of the Indictment with conspiracy to commit bank extortion, attempted bank extortion and using a firearm during and relation to a crime of violence. He pleaded guilty to Counts II and III of the Indictment which charged him with attempting to obtain by extortion $40,000 from a bank and carrying firearms in relation to attempted bank extortion. On January 5, 2012, Mr. Swopes was resentenced to 140 months' imprisonment on Count II and 120 months' imprisonment on Count III to be served consecutively. R. 452.

---

[1] Court is permitted to "reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment)." 18 U.S.C. § 3582(c)(1)(A).

[2] The information about the offenses discussed herein was taken from documents in this case including Indictment, Plea Declaration, Presentence Investigation Report, Government's Version of Offense, Seventh Circuit Opinion and Government's Response to Defendant's Request for Compassionate Release.

Mr. Swopes played a comparatively minor role in this case. He did not plan kidnapping, recruit others into the scheme, purchase supplies for kidnapping, supervise others, pick up bank's money or torture drug dealer Charles Zachary. Significantly, planning that ultimately resulted in charges took place long before Mr. Swopes was solicited to participate in the crime by lead defendant Tony Callion.

Back in June of 2008 Callion and Zachary's cousin, co-defendant Daniel Gibbs, discussed kidnapping Zachary and obtaining ransom of $75,000, half in cash and half in drugs. Callion targeted drug-trafficker Zachary because Zachary owned Callion drug money. The following month, during Fourth of July barbeque party at co-defendant Hal Durham's house, Callion, Gibbs, Gibb's girlfriend Natalie Hoisington, and Gibb's father Durham further discussed kidnapping; and, Callion made Gibbs responsible for obtaining handcuffs and duct tape. On July 9, 2008, Callion met with Gibbs, Hoisington and Durham to put their plan into action. When Callion, Gibbs and Hoisington went to locate Zachary, they saw Mr. Swopes riding a bicycle and Callion recruited Mr. Swopes to do a "lick", which Mr. Swopes understood to mean robbery. Mr. Swopes agreed to participate in a "lick" unaware that the plan was to kidnap a drug dealer.

Later, when Mr. Swopes was in a vehicle with Callion, Israel Collins, Gibbs and Hoisington he heard co-defendants discussing kidnapping. Callion gave Mr. Swopes a gun and told him to get out of the vehicle and abduct Zachary, but Mr. Swopes hesitated and Zachary drove away. Defendants followed Zachary and at 3:00 a.m. Mr. Swopes and armed Collins[3] abducted Zachary as he was exiting his vehicle near his house. Mr. Swopes handcuffed Zachary, placed tape over his eyes, helped to put him in a vehicle and helped to walk him to Durham's residence. There co-defendants added duct tape to Zachary's face, head and legs; Callion pulled

---

[3] Agent Brian Wentz told probation officer that he believed Mr. Swopes was armed when he and Collins abducted Zachary. PSR, p. 6, line 89.

on Zachary's toes with a wrench; Durham hit Zachary on the head with a revolver, intimidated him with a revolver loaded with blanks and used a pit bull to scare him; and Gibbs threatened to use a potato as a silencer. Mr. Swopes did not participate in torturing Zachary. At one point Zachary suggested obtaining money for his release from his girlfriend who worked at a bank and Mr. Swopes was one of the individuals who participated in telephone calls with Zachary's girlfriend. The girlfriend notified the authorities and after Callion, Durham and Hoisington picked up bank's money, all six defendants were arrested. Zachary's physical injuries primarily consisted of abrasions and bruises.

Collins, Hoisington and Gibbs pleaded guilty to the same counts as Mr. Swopes whereas Callion and Durham went to trial and were found guilty of Counts I and II and not guilty of Count III. All co-defendants, including more culpable co-defendants, are released or will be released before Mr. Swopes. Specifically, Callion the leader and organizer who initiated abduction of Zachary for a drug debt; recruited other participants; planned criminal activities with others; required Gibbs to purchase handcuffs and duct tape; and tortured Zachary by pulling on his toes with a wrench will be released before Mr. Swopes. Another co-defendant, Durham, who participated in planning abduction; allowed Zachary to be held in his house after abduction; and tortured Zachary by playing Russian roulette, hitting him on the head with a firearm, shooting at his leg with blanks and threatening him with a pit bull dog, will also be released before Mr. Swopes. Mr. Swopes' projected release date is January 10, 2027; Callion's release date is August 21, 2025; Gibbs was released in 2017; Israel Collins' release date is August 26, 2021; Hal Durham's release date is February 4, 2022; and Natalie Hoisington was released in 2018. Mr. Swopes is one of the least culpable defendants in this case, yet he will be serving the longest sentence unless he is granted compassionate release. To date Mr. Swopes has served

3

more than 150 months in custody, and, with consideration of good time credit he has served

nearly 180 months or almost 70% of his sentence.

## II.    LEGAL STANDARD

Section 603(b) of the First Step Act ("FSA") amended 18 U.S.C. § 3582(c)(1)(A) to

allow courts to modify defendant's term of imprisonment.

> (A) … upon motion of the defendant after the defendant has fully exhausted all
> administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the
> defendant's behalf or the lapse of 30 days from the receipt of such a request by the
> warden of the defendant's facility, whichever is earlier, may reduce the term of
> imprisonment (and may impose a term of probation or supervised release with or without
> conditions that does not exceed the unserved portion of the original term of
> imprisonment), after considering the factors set forth in section 3553(a) to the extent that
> they are applicable, if it finds that—
>> (i) extraordinary and compelling reasons warrant such a reduction;
>> …
>> And that such a reduction is consistent with applicable policy statements
>> issued by the Sentencing Commission….18 U.S.C. § 3582(c)(1)(A).

Mr. Swopes satisfies three requirements under the statute, specifically: 1.) he exhausted

administrative remedies; 2.) extraordinary and compelling reasons warrant reduction of Mr.

Swopes' sentence; and 3.) 3553(a) factors support compassionate relief in this case.

### A.    Mr. Swopes Satisfied Exhaustion Requirement

Mr. Swopes fully exhausted all administrative rights to appeal a failure of the Bureau of

Prisons ("BOP") to bring a motion on his behalf. Mr. Swopes' request for compassionate release

was denied by Warden of FCI Pekin. **Exhibit 1, Warden's Response.**

### B.    Extraordinary and Compelling Reasons Warrant Mr. Swopes' Immediate
###       Release from BOP Custody

In this case Mr. Swopes' damaged/absent right lung[4], hyperlipidemia (high blood

cholesterol), obesity/overweight and gastro-esophageal reflex disease ("GERD") increase his risk

of developing severe and possibly lethal complications if he is reinfected with COVID-19 and

---

[4] To date counsel has not received a response to release of medical records from Cook County Hospital.

constitute extraordinary and compelling reasons. **Exhibit 2, Medical Records, ps. 1-4.**
Sentencing Commission has not issued new policy statements since the passage of the FSA to
define extraordinary and compelling reasons. Courts may, but are not required, to consider
existing policy statements in U.S.S.G. § 1B1.13 cmt. n.1(A)-(D) to determine existence of
extraordinary and compelling reasons. *United States v. Gunn,* 980 F.3d 1178, 1180 (7th Cir.
2020); *United States v. Young*, 458 F.Supp.3d 838, 844-45 (M.D. Tenn. 2020); *United States v.
Redd*, 444 F.Supp.3d 717, 724, 727 (E.D. Va. 2020) (n. 18 collecting cases). Application notes
1(A)-(C) to U.S.S.G. § 1B1.13 list examples of "extraordinary and compelling reasons" and
application note 1(D) contains a catch all provision recognizing that not all extraordinary and
compelling reasons can be foreseen and enumerated. U.S.S.G. § 1B1.13 cmt. n.1(A)-(D).

### 1. COVID-19 Pandemic and Virus' Spread in the BOP Is Unprecedented Public Health Crisis

Coronavirus has infected over 31,000,000 and tragically killed more than 550,000 people
in the United States.[5] In BOP 46,990 inmates and 6,801staff members have tested positive for
COVID-19, and tragically 230 inmates and 4 staff members have died.[6] The number of inmates
infected with virus is almost certain to be an undercount, because testing within BOP was sparse
during the early days of the pandemic and some COVID-19 cases are probably missing from the
count.

Notably, COVID-19 infection rate for prisoners is 5.5 times higher than infection rate in
the general population of the United States[7] and prisoners have "more severe clinical
presentation, higher rates of ICU admissions, vasopressors requirement, intubation, in-hospital

---

[5] https://covid.cdc.gov/covid-data-tracker/#datatracker-home, recovered inmates were added to the count (last visited on April 12, 2021).
[6] https://www.bop.gov/coronavirus/ (last visited on April 12, 2021).
[7] Brendan Saloner, Ph.D., et.al., *Covid-19 Cases and Deaths in Federal and State Prisons,* JAMA (July 8, 2020), https://jamanetwork.com/journals/jama/fullarticle/2768249.

mortality, and 30-day mortality."[8] Prisons' living conditions prevent inmates from maintaining social distance and result in "an extraordinarily high risk of accelerated transmission of COVID-19." *United States v. Jemal,* 2020 WL 1701706, at *1 (E.D. Pa. Apr. 8, 2020). "Prisons are tinderboxes for infectious disease." *United States v. Rodriguez*, 451 F.Supp.3d 392, 394 (E.D. Pa. 2020). 'Crowded dormitories, shared lavatories, limited medical and isolation resources, daily entry and exit of staff members and visitors, continual introduction of newly incarcerated and detained persons, and transports of incarcerated or detained persons in multiperson vehicles for court-related, medical, or security reasons' make social distancing and containment of virus challenging. *United States v. Gakhal,* 2020 WL 3529904, at *2 (N.D. Ill. June 30, 2020). Additionally, "delays in medical evaluation and treatment, rationed access to soap, water,… clean laundry, [and] insufficient infection-control expertise"[9] in jails further facilitate the spread of virus.

As long as Mr. Swopes is incarcerated, he faces an increased risk of being reinfected because in prison he "cannot protect himself from the spread of a dangerous and highly contagious virus." *United States v. Perez*, 451 F.Supp.3d 288, 294 (S.D.N.Y. 2020). Mr. Swopes is serving his sentence at FCI Pekin where 766 inmates (more than half of the population) and 84 staff members tested positive.[10] Despite these high numbers of COVID-19 transmissions, FCI Pekin is presently operating *above* its maximum occupancy capacity of 1164 inmates[11] and houses 1174 inmates (983 at FCI and 181 at Camp F).[12]

---

[8] Ahmed M. Altibi, et. al., *Comparative Clinical Outcomes and Mortality in Prisoner and Non-Prisoner Populations Hospitalized with Covid-19: A Cohort from Michigan,* Medrxiv (August 11, 2020), https://www.medrxiv.org/content/10.1101/2020.08.08.20170787v1.
[9] Joseph A. Bick, *Infection Control in Jails and Prisons,* 45 Clinical Infectious Diseases 1047 (Oct. 2007), https://academic.oup.com/cid/article/45/8/1047/344842.
[10] https://experience.arcgis.com/experience/ab22fb4c564e4f4b986e257c685190e8/page/page_2/ (last visited on April 12, 2021).
[11] https://inmate101.com/prisons/illinois/federal/fci-pekin/.
[12] https://www.bop.gov/locations/institutions/pek/.

As of April 12, 2021, FCI Pekin reported 12 positive cases among staff and no positive cases among the inmates, but zero presently known cases does not mean that there are no positive cases or that inmates at FCI Pekin are protected from another wave of COVID-19 infections. Courts have granted compassionate releases where *no* positive cases were reported for inmates *and* staff recognizing that vulnerable inmates are unable to protect themselves and follow CDC guidelines. (emphasis added). *See e.g. United States v. Shannon*, 13-cr-535, Dkt. 97 (N.D. Ill. June 26, 2020); *United States v. Feucht,* 462 F.Supp.3d 1339, 1342 (S.D. Fla. 2020) ('[z]ero *confirmed* COVID-19 cases is not the same thing as zero COVID-19 cases'); *United States v. Atkinson,* 2020 WL 1904585, *2-4 (D. Nev. Apr. 17, 2020); *United States v. Amarrah,* 458 F.Supp.3d 611, 615 (E.D. Mich. 2020); *United States v. Ben-Yhwh,* 453 F.Supp.3d 1324, 1330 (D. Haw. 2000). As another court in this district stated: "all that one can say with any reasonable certainty is that a correctional institution is free of confirmed-positive inmates and staff until it isn't… [A] person may carry and transmit coronavirus without being symptomatic (and thus without any reason to even be considered for testing), and the fact that correctional institutions have a constant influx of personnel who come from and return to the community large and thus may contract coronavirus without being detected by BOP, basically eliminate any guarantee, or anything close to a guarantee, that [Mr. Swopes] has not been and will not be exposed." *United States v. Manning*, 15-cr-5007, Dkt. #90 (April 20, 2020).

**2.  Mr. Swopes' Health Conditions Place Him at a High Risk of Severe Illness or Death from COVID-19**

Courts have found that pandemic combined with a defendant's high-risk of developing serious complications from COVID-19 constitute "an extraordinary and compelling reason"

supporting compassionate release.[13] This is the case here. Continued incarceration places Mr. Swopes' health and life in jeopardy. An increased risk of reinfection with COVID-19 in prison and Mr. Swopes' medical conditions, damaged/absent lung, hyperlipidemia, GERD and excess weight greatly increase his chances of developing severe or lethal symptoms from coronavirus.

Even though Mr. Swopes did not have severe symptoms when he initially contracted COVID-19 in January of this year, it is impossible to predict what symptoms he might experience upon reinfection. **Exhibit 2, ps. 5, 6.** Reinfections are not common, but the number of reinfections is increasing[14] and the new fast spreading variants of the virus further increase the risk of reinfection.[15] While in some cases reinfection results in milder symptoms, in other cases reinfection is accompanies by more serious symptoms[16] because "[m]ore intense involvement of infection in patient's lungs is highly expected when a person becomes coronavirus positive for the second time."[17] Just as coronavirus' severity varies on a person-by- person basis, the severity of symptoms after reinfection also varies significantly from one person to another.[18] "Variables such as the initial dose of virus, possible differences between variants of SARS-CoV-2 and changes in a person's overall health could all affect the severity of a reinfection. 'There are almost as many unknowns about reinfection as'" there are about initial infection.[19] Of additional concern is that in rare cases "antibodies produced in response to SARS-CoV-2 help, rather than

---

[13] *See e.g., United States v. Gonzalez*, 2020 WL 1536155, at *2–3 (E.D. Wash. Mar. 31, 2020); *United States v. Muniz*, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020); and *United States v. Colvin*, 451 F.Supp.3d 237, 241 (D. Conn. 2020).

[14] https://www.sciencemag.org/news/2020/11/more-people-are-getting-covid-19-twice-suggesting-immunity-wanes-quickly-some.

[15] https://www.washingtonpost.com/business/can-you-get-covid-twice-what-reinfection-cases-really-mean/2021/04/11/1c738674-9b29-11eb-b2f5-7d2f0182750d_story.html.

[16] https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(20)30764-7/fulltext.

[17] https://www.aa.com.tr/en/latest-on-coronavirus-outbreak/covid-19-reinfection-may-hit-more-severely-expert/2065608.

[18] https://www.nature.com/articles/d41586-020-02506-y.

[19] *Id.*

fight, the virus during a second infection."[20] Moreover, it is not only that some people suffer more serious symptoms with reinfection,[21] but several people have died after contracting COVID-19 for the second time.[22] Therefore, Mr. Swopes' mild symptoms and recovery from COVID-19 gives no guarantee that he will not suffer from severe and potentially lethal symptoms if he is reinfected.

In 1998 Mr. Swopes was a victim of a violent crime – he was shot in the chest. PSR, p. 16, lines 349-353. Mr. Swopes recalled that the bullet caused his lung to collapse, but he is uncertain if the lung was removed. Because having a damaged lung or only one functional lung is rare and the coronavirus is a new disease, it seems there have not been any studies focusing on COVID-19 risks of such individuals. However, Mark from American Lung Association believes that people like Mr. Swopes are at risk of developing severe complications from COVID-19 infection:

> Even though there are no specific studies that I am aware of, I do think it is possible that someone with one lung would be at a greater risk for a more serious COVID-19 infection, the same way they would be at higher risk for any lung infection. Lower lung function makes the lungs less able to compensate during a lung infection, so this would likely be true with a COVID-19 infection, as well as other types of respiratory infections and pneumonias. **Exhibit 3, E-mail.**

In general it is well known that individuals "with impaired or compromised lung conditions…are at particular risk for COVID-19 with worse outcomes."[23] CDC recognizes that persons with

---

[20] *Id*.
[21] https://www.bbc.com/news/health-54512034;
https://www.healthgrades.com/right-care/coronavirus/covid-19-reinfection-what-to-know.
[22] https://www.insider.com/18-year-old-died-second-covid-19-infection-2021-1;
https://www.cbsnews.com/news/covid-twice-death-dutch-woman/;
https://112.international/society/first-death-after-reinfection-with-covid-19-observed-in-germany-58312.html;
https://timesofindia.indiatimes.com/city/lucknow/kgmu-docs-mother-dies-of-reinfection-after-six-months/articleshow/81382967.cms.
[23] COVID-19 in Chronic Lung Disease: What You Need to Know Pulmonology Advisor (March 24, 2020), https://www.pulmonologyadvisor.com/home/topics/lung-infection/potential-effects-of-novel-coronavirus-disease-on-patients-with-chronic-lung-disease/.

chronic lung diseases are at increased risk of "illness severity and adverse outcomes" from coronavirus.[24]

In addition to a respiratory condition Mr. Swopes suffers from hyperlipidemia or high cholesterol and GERD. **Exhibit 2, p. 1**. Notably, one study showed that "26% of patients hospitalized because of COVID-19 were reported to have hyperlipidemia."[25] According to CDC, individuals with gastrointestinal disorder and/or hyperlipidemia are vulnerable to developing serious symptoms if infected with COVID-19.[26] Further, GERD "may be associated with a higher risk of death from COVID-19."[27] Moreover, Mr. Swopes is overweight, which further places him at a risk of developing serious symptoms if reinfected with coronavirus. Mr. Swopes' 2017 and 2018 physical exams show that he had a body mass index ("BMI") of 30, which places him in obesity range and in 2019 his BMI was 29, only one level short of obesity (overweight corresponds to BMI of 25-29). **Exhibit 2, ps. 2-4.** Both overweight and obesity are risk factors for severe COVID-19 symptoms.[28] Mr. Swopes did not have an annual physical exam in 2020 probably resultant of FCI Pekin postponing checking the well-being of its inmates during pandemic.

In sum, Mr. Swopes' medical conditions place him at a grave risk of developing potentially life-threatening complications if he is reinfected with coronavirus. His inability to protect himself from COVID-19 infection and reinfection during incarceration combined with a

---

[24] Centers for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease,* https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html.
[25] Zohaib Iqbal, et. al., *Managing hyperlipidaemia in patients with COVID-19 and during its pandemic: An expert panel position statement from HEART UK* (Sept. 15, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7490256/.
[26] https://www.cdc.gov/mmwr/volumes/69/wr/mm6913e2.htm.
[27] https://agencia.fapesp.br/gastroesophageal-reflux-may-increase-risk-of-dying-from-covid-19-study-suggests/34468/.
[28] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html

significant risk of developing serious and potentially deadly complications constitute extraordinary and compelling reasons supporting compassionate release in this case.

Subsequent to Mr. Swopes' resentencing on January 5, 2012 there has been a significant change in circumstances that no one could have foreseen. Surely at resentencing the Court " 'did not intend for that sentence to include [Mr. Swopes] incurring a great and unforeseen risk of severe illness or death brought' on by a global pandemic." *United States v. Zukerman*, 451 F.Supp.3d 329, 336 (S.D.N.Y. 2020). It is well accepted that "death in prison is not to be ordered lightly, and the probability that a convict will not live out his sentence should certainly give pause to a sentencing court." *United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006). Here, resultant of Mr. Swopes' underlying medical conditions and pandemic, his sentence could turn out to be a death sentence if he is not released from BOP.

**C.      A Sentence Reduction Is Consistent with Factors Enumerated in 18 U.S.C. § 3553(a)**

Finally, 18 U.S.C. § 3553(a) factors support compassionate release in this case.

**1.      Mr. Swopes Was Sentenced to 120 Consecutive Months for Violating an Unconstitutionally Vague Statute**

At the original sentencing hearings Mr. Swopes and co-defendant Collins faced the same advisory guidelines range of 151-188 months' imprisonment on Count II (attempted bank extortion) and consecutive 120 months' imprisonment on Count III (§ 924(c)). Recently, this Court resentenced similarly-situated Collins to 175 months' imprisonment following his filing of a petition pursuant to 28 U.S.C. § 2255. (Collins, R. 495). In response to Collins' petition, the government agreed that Collins' § 924(c) conviction should be vacated and requested for Collins to be resentenced. (20-cv-2290, R. 13, p. 3).

11

In deciding this motion, the Court should take into consideration that as in Collins' case, Mr. Swopes' § 924(c) conviction was also based on unconstitutionally vague statute. Specifically, Mr. Swopes was sentenced to consecutive 120 months' imprisonment for discharging a firearm during and relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and 2. At the time of his conviction, crime of violence was defined as a felony that

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense. 18 U.S.C. § 924(c)(3).

In 2019 residual clause contained in 18 U.S.C. § 924(c)(3)(B) was invalidated as unconstitutionally vague. *United States v. Davis*, 139 S. Ct. 2319, 2336 (2019). The predicate offense here, attempted bank extortion, does not fall into a crime of violence under the remaining elements clause of the statute, 18 U.S.C. § 924(c)(3)(A).

To determine if an offense qualifies as a "crime of violence" courts apply categorical approach to discern the "minimum conduct criminalized" by the statute, *Moncrieffe v. Holder,* 133 S. Ct. 1678, 1684-85 (2013); and "disregar[d] the means by which the defendant committed his crime." *Mathis v. United States*, 136 S. Ct. 2243, 2248 (2016). Bank extortion, criminalized under 18 U.S.C. § 2113(a), provides as follows:

> Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank…18 U.S.C. § 2113(a).

The above statute is divisible - it criminalizes two different and distinct offenses, bank robbery and bank extortion. *United States v. Watson*, 881 F.3d 782, 786 (9th Cir. 2018). Jury instructions

in this case defined extortion as "obtaining money or property from another person, with his or her consent, induced by the wrongful use of actual or threatened force, violence or fear." (*United States v. Duham,* 08 -cr-549, R. 666 at 31; R. 146 at 38 citing to H.R. REP. 99-797, 1986 U.S.C.C.A.N. 6183, 33). Under this definition it is possible to commit bank extortion by making victim "fear" financial harm and without as much as a threat of physical harm. (Bank extortion does not require even a threat of violence. *See United States v. Valdez,* 158F.3d 1140, 1143 n.4 (10th Cir. 1998)). Consequently, attempted bank extortion does not quality as a crime of violence under the surviving elements clause of 18 U.S.C. § 924(c)(3). Then, in considering 3553(a) factors, the Court should take into consideration that 1.) Mr. Swopes was sentenced to consecutive 120 months' imprisonment based on unconstitutionally vague law; and, 2.) Collins' sentence on Count III was vacated and he was resentenced to 175 months' imprisonment.

### 2. Mr. Swopes Is Not Being Provided With Medical Care in the Most Effective Manner

It almost goes without saying that Mr. Swopes will not be provided with "medical care…in the most effective manner" if he is to remain in prison. *See* 18 U.S.C. § 3553(a)(2)(D). Even before pandemic the BOP was failing to provide adequate healthcare[29] and suffered from shortages of medical staff.[30] The situation has significantly worsened with the pandemic.

> For example, a 2020 remote inspection report found that at the Metropolitan Detention Center (MDC) Brooklyn, which houses over 1,600 inmates, shortages in medical staff resulted in the facility struggling to meet the medical needs of inmates without COVID-19 symptoms. BOP staff reported that 160 MDC

---

[29] Erica Zunkel, *Article: 18 U.S.C. § 3553(a)'s Undervalued Sentencing Command: Providing a Federal Criminal Defendant With Rehabilitation, Training, and Treatment in "The Most Effective Manner,"* 9 Notre Dame J. Int'l & Comp. L. 49, 57–60 (2019) (detailing the BOP's systematic failure to procure healthcare for inmates), https://scholarship.law.nd.edu/cgi/viewcontent.cgi?article=1094&context=ndjicl.

[30] U.S. Dep't of Justice, *Office of the Inspector General Review of the Federal Bureau of Prison's Medical Staffing Challenges*, at i (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf and U.S. Dep't of Justice, *Top Management and Performance Challenges Facing the Department of Justice–2019* at 3-4 (October 2019), https://oig.justice.gov/sites/default/files/reports/2019.pdf.

Brooklyn inmate sick call requests dating to early July 2020 had not been scheduled or seen as of late September 2020. [31]

Pandemic hindered the ability of BOP to provide adequate medical care for all inmates and Mr. Swopes' medical needs will be "best met here with medical care outside the prison system." *United States v. Gutierrez*, 2020 WL 3839831, at *2 (D. Minn. July 8, 2020). BOP facilities, including FCI Pekin where Mr. Swopes is housed, have been devastated by pandemic. Administrative note shows that medical staff at FCI Pekin is struggling to provide inmates with timely medical care, i.e. intake physicals are extended by 7 days and chronic care visits are extended from 14 to 30 days. **Exhibit 2, p. 7.** Treatment for a tooth ache that was causing Mr. Swopes' headaches was "deferred until an emergency evaluation/radiograph appointment could be coordinated under the existing circumstances, further notice from our institution or new dental BOP guidelines." *Id.* **at 8.**

During incarceration Mr. Swopes developed a disorder for which he has not received proper diagnosis or effective treatment. On October 20, 2020, he complained of increasing "burning pains after eating and digesting food" and 10 days later that "food [was] sticking in his throat after meals" and omeprazole prescribed to treat GERD was not decreasing the symptoms. *Id.* **at 9, 10.** Mr. Swopes was asked to continue taking medication for 20 more days and to "follow up with medical for possible EGD." *Id.* **at 10.** On December 18 Mr. Swopes advised medical that famotidine also did not relief his symptoms; that he felt that his throat was swelling; that eating smaller portions was not relieving the "urge to vomit"; and that drinking more liquids and sitting after meals have not improved his condition. *Id.* **at 11.** He was then placed on omeprazole, which he took in the autumn of last year with no results. *Id.* **at 10, 11.** January

---

[31] U.S. Dep't of Justice, *Top Management and Performance Challenges Facing the Department of Justice–2020* at 17 (October 2020), ("more must be done to improve healthcare staffing levels, relative to the inmate population.") https://oig.justice.gov/sites/default/files/reports/2020.pdf.

medical notes state that Mr. Swopes has been suffering from "progressive dysphagia [swallowing difficulties][32] with solid foods" for five months and medications to reduce stomach acid have not provided any relief. ***Id.* at 12**. The need for EGD was mentioned again – indicating that the doctor was uncertain what was causing Mr. Swopes' symptoms and that a diagnostic procedure for proper diagnosis and treatment was necessary. ***Id.*** While medical records have a brief summary of Mr. Swopes' symptoms, the actual symptoms he reported to counsel and medical staff were more serious. Specifically, after large meals or meals with meat Mr. Swopes often felt that food was stuck in his throat and chest, sometimes he threw up and at times he felt hot perhaps because he had fever. Occasionally these symptoms lasted for several days and were particularly severe at night. Mr. Swopes has been suffering from these symptoms for almost eight months and to date have not been taken for EGD[33], which doctor seems to believe, will uncover the cause of Mr. Swopes' agonizing symptoms. Mr. Swopes' requests for medical attention have resulted in unsuccessful experiments with drugs and a failure to uncover the medical problem.

Resultant of COVID-19-related delays in the BOP healthcare system Mr. Swopes' problem remains undiagnosed and untreated. A court found that where defendant is "unlikely to be able to get the medical care he needs in the midst of an ongoing pandemic" to be a factor weighing in favor of compassionate release and referred to an article discussing "'wholly inadequate medical care' in federal prisons." *United States v. Burrill*, 445 D.Supp.3d 22, 27 (N.D. Cal. 2020).

---

[32]https://www.nhsinform.scot/illnesses-and-conditions/stomach-liver-and-gastrointestinal-tract/dysphagia-swallowing-problems#:~:text=Dysphagia%20is%20the%20medical%20term,up%2C%20sometimes%20through%20the%20nos.

[33] EGD, "(esophagogastroduodenoscopy) is a procedure to diagnose and treat problems in your upper GI (gastrointestinal) tract," https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/upper-gi-endoscopy#:~:text=An%20upper%20GI%20endoscopy%20or,small%20intestine%20(the%20duodenum).

Mr. Swopes is not presently receiving needed medical care and he would have a higher level of care outside of the facility. His medical needs have not been and is unlikely to be met during ongoing pandemic. BOP's failure to provide adequate medical care and health risks that continued incarceration poses to him weigh heavily in favor compassionate release. Living in the community under home confinement conditions, with the ability to self isolate and with access to health care, will dramatically reduce Mr. Swopes's risk of reinfecting with COVID-19 and provide him with access to medical facilities for diagnosis and treatment.

3.     **More Than 150 Months That Mr. Swopes Spent in Custody Is Sufficient to Reflect the Seriousness of the Offense and Provide Just Punishment for the Offense**

Although the crime Mr. Swopes committed was undeniably serious, he has already paid heavily for his wrongful conduct. More than 150 months that Mr. Swope spent incarcerated is sufficient to reflect the seriousness of the offense and to provide just punishment for the offense. A "just punishment" factor is particularly important under present circumstances. For the past year Mr. Swopes' incarceration was been dangerous to his health resultant of high health risks he faces from COVID-19 in prison and BOP's inability to provide him with medical care to diagnose and properly treat his ailment. "Requiring [a defendant] to be subjected to this severe risk for an extended period does not amount to just punishment, nor does it … promote respect for the law." *United States v. Body*, 2020 WL 2745972 at *2 (N.D. Ill. May 27, 2020).

Additionally, Mr. Swopes' incarceration during pandemic has increased the severity of his sentence beyond what was originally contemplated. For more than a year his incarceration has been more severe and restrictive resultant of repeatedly instituted lockdowns in his unit to combat transmission of the virus. During lockdowns Mr. Swopes is confined to his cell for

nearly 24 hours per day (for a month and then on and off); prohibited from using commissary, telephone and computer; and eating primarily boxed lunch-type meals.

### 4. Mr. Swopes Has Been Self-Rehabilitating and His Mother Will Gladly Care for Her Son Upon Release

During his time in prison, Mr. Swopes has worked diligently toward bettering himself and preparing for reentry. He has taken various courses during incarceration, participated in GED classes, worked "as unit orderly with above average work performance evaluations," regularly communicated with family members and friends, maintained clear conduct since July, 2017 and completed financial responsibility in March, 2015. **Exhibit 4, Individualized Needs Plan- Program Review and Certificates.**

Counsel spoke to Mr. Swopes' mother, Nadine Jones, who said that she will gladly provide housing and financial support to her son upon release. Ms. Jones lives alone in an apartment that she rents and she is agreeable to Mr. Swopes living with her on home confinement with electronic monitoring.

### CONCLUSION

For the foregoing reasons, Mr. Swopes respectfully requests that the Court modify his sentence of imprisonment under 18 U.S.C. § 3582(c)(1)(A)(i) to time served.

Respectfully submitted,
/s/Yelena A. Dolgosheeva

DolTer Law, P.C.
Mailing Address: P.O. Box 5382, Buffalo Grove, Illinois 60089
Telephone: 847-208-4348
Fax: 312-267-1810
E-mail: dolgosheeva2002@yahoo.com

17

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **08 CR 549** |
| **v.** | ) | **Honorable Rebecca R. Pallmeyer** |
| | ) | |
| | ) | |
| **SHERMAN SWOPES,** | ) | |
| **Defendant.** | ) | |

**TO:** Shawn McCarthy
Assistant U.S. Attorney
219 South Dearborn Street, 5th Floor
Chicago, Illinois  60604

**CERTIFICATE OF SERVICE**

    I, Yelena A. Dolgosheeva, an attorney, certify that I caused a copy of Amended Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), to be electronically filed with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division via the CM/ECF e-filing system on April 16, 2021, which sent electronic notification of the filing the same day to the above-captioned person.

                                /s/Yelena A. Dolgosheeva

DolTer Law, P.C.
Mailing Address: P.O. Box 5382, Buffalo Grove, Illinois 60089
Telephone: 847-208-4348
Fax: 312-267-1810
E-mail: dolgosheeva2002@yahoo.com